1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

9
10
11
12
13
14
15
16

AITANG SEE,                                   )       1:10-cv-01519 LJO-MJS HC
                                              )
                  Petitioner,                 )       FINDINGS AND RECOMMENDATION
                                              )       REGARDING PETITION FOR WRIT OF
        v.                                    )       HABEAS CORPUS
                                              )
P.D. BRAZELTON,                               )
                                              )
                  Respondent.                 )
_____ )

17          Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

18   pursuant to 28 U.S.C. § 2254. Respondent, P.D. Brazleton, as acting warden of Pleasant

19   Valley State Prison, is hereby substituted as the proper named respondent pursuant to Rule

20   25(d) of the Federal Rules of Civil Procedure.

21   **I.      BACKGROUND**

22          Petitioner is currently in the custody of the California Department of Corrections

23   pursuant to a judgment of the Superior Court of California, County of Tulare, following his

24   conviction by jury trial on April 17, 2008, for first degree murder and conspiracy to commit

25   murder. (Clerk's Tr. at 546-47.) The jury found that the crimes were committed for the benefit

26   of, at the direction of, or in association with a criminal street gang, that the murder was

27   committed while Petitioner was an active participant in a criminal street gang, and found true

28   an a vicarious discharge of a firearm allegation. (Id.) Petitioner was sentenced to an

1  indeterminate term of 50 years to life. (Id.)

2       On December 18, 2009, the California Court of Appeal, Fifth Appellate District, affirmed

3  the judgment of the trial court. (Lodged Doc. 1.) Petitioner filed a petition for review in the

4  California Supreme Court.  The petition was summarily denied on March 30, 2010. (Lodged

5  Doc. 2.)

6       On August 23, 2010, Petitioner filed the instant federal habeas corpus petition.

7  Petitioner two claims for relief: (1) that the trial court abused it's discretion and violated

8  Petitioner's due process rights by excusing a juror prior to deliberations, and (2) that the court

9  violated Petitioner's right to a fair trial by permitting the use of an excessive number of gang

10 incidents as proof of gang enhancements. (Pet., ECF No. 1.) On January 19, 2011,

11 Respondent filed an answer to the petition. (Answer, ECF No. 16.) Petitioner filed a traverse

12 to the answer on February 22, 2011. (Traverse, ECF No. 18.)

13 **II.    STATEMENT OF THE FACTS[1]**

14         Around 6:30 p.m. on October 1, 2006, 16-year-old Robert Trevino was
15   throwing a football with other neighborhood children on a residential street. Five
     Asian males approached him; one had a handgun in his waistband. Four of the
16   males wore blue and black bandannas, covering their faces from the nose
     down. The one male whose face was uncovered shook hands with Trevino. He
17   then pointed behind Trevino and Trevino turned around. The individual with the
     handgun shot Trevino in the head, from a distance of three or four feet. The five
18   Asian males then fled.

19         Police officers arrived at the scene and found Trevino lying on the side
     of the road, bleeding from a head wound. A police officer checked his pulse, but
20   found none. A .380-caliber shell casing was found in the middle of the road.

21         Witnesses identified four of the five Asian males as Chawa, Lavang,
     Aitang, and Billy Her. Her was identified as the individual who shook hands with
22   Trevino. Chawa was identified as the person who shot Trevino.

23         On October 6, 2006, the police obtained and executed a search warrant
     for appellants' residences. Police arrested Aitang at his apartment and found
24   writings and clothing relating to the Oriental Troops (OT) gang in his bedroom.

25         Police were unable to locate Chawa, but located a .380-caliber
     semiautomatic handgun beneath the mattress in Chawa's bedroom. Three live
26   rounds were retrieved from the magazine.

27
         [1]The Fifth District Court of Appeal's summary of the facts in its December 18, 2009 opinion is presumed
28  correct.  28 U.S.C. §§ 2254(e)(1).

Subsequent test bullets from the handgun were found to match the bullet retrieved from Trevino's head.

Lavang was arrested on October 17, 2006, and Chawa the following day. Lavang admitted to the officers that he was one of the individuals who approached Trevino right before the shooting, but denied that he shot him or that the group planned to shoot him.

At trial, Lavang's former girlfriend, Tawny Chamberlain, testified that she hung out with members of the OT gang, and that, at the time of the shooting, she was pregnant with Lavang's child. Chamberlain spoke to Chawa sometime after the shooting. When she asked him why he shot Trevino, Chawa said that he "deserved it" and was "dissing the hood."

Her, who was offered a plea of voluntary manslaughter with a criminal street gang enhancement, testified as a prosecution witness. He testified that he, Chawa, Lavang, Aitang, and Chawa's younger brother approached Trevino. Her shook hands with Trevino and asked him about his brother. He denied pointing his finger to distract Trevino and he denied having any knowledge that Chawa, whom he identified as the shooter, planned to shoot Trevino.

According to Her, he overheard a conversation between Chawa and an OT gang member, Jack Noi, a few weeks prior to the shooting. Noi told Chawa that he was having a problem with Trevino in juvenile hall. Chawa told Noi "don't worry about it," and said he would take care of it.

Officer Luma Fahoum testified as an expert on the OT gang in Tulare County. According to Fahoum, the OT is a predominately Asian male gang, and the location where Trevino was shot is an area OT claims as its "turf." The Nortenos, a Hispanic gang, is a rival gang to the OT in Tulare County. The Nortenos identify with the color red, number 14, and the letter N. The OT identify with the color blue, numbers 15 and 20, and the letters O and T. But due to criminal street gang prosecutions, OT members often wore neutral colors, such as white, black and gray. As of October 1, 2006, there were about 50 documented OT members.

Officer Fahoum described the OT as the "most vicious and deadly gang in Visalia" for its size. The primary activities of the OT include murder, carjacking, witness intimidation, assault with a firearm, drive-by-shootings, robbery, and burglary. Officer Fahoum described multiple "predicate offenses" committed by various OT members.

Based on self-admissions, associations, tattoos, and clothing, Officer Fahoum opined that Chawa, Lavang, Aitang, Chawa's brother, and Her were active members of the OT. Fahoum described the Mongolian Boys Society (MBS) and the Lahu Pride Crips (LPC) as "entry-level" OT gang members. According to Fahoum, Trevino was a validated Norteno.

In response to the following hypothetical-if a group of OT members, most of whom had blue or black bandannas covering their faces, approach a rival gang member and shoot him in the head-Officer Fahoum opined that the shooting was committed in association with and for the benefit of the OT.

Defense

1

2  Chawa's younger brother testified and suggested Her was the shooter. Although Chawa's brother acknowledged that he lived with Chawa and his

3  family in the house where the handgun was found, he claimed Her had asked him prior to the search to take and store the handgun. Chawa's brother said he

4  took the gun and put it under the bed because he and Her were both in the same gang, the MBS.

5  (Lodged Doc. 1, pp. 3-6.)

6  **III.    DISCUSSION**

7  **A.    Jurisdiction and Standard of Review**

8  On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

9  of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

10  enactment. Lindh v. Murphy, 521 U.S. 320, 326 (1997); Jeffries v. Wood, 114 F.3d 1484,

11  1499 (9th Cir. 1997). The instant petition was filed after the enactment of AEDPA; thus, it is

12  governed by its provisions.

13  Under AEDPA, an application for a writ of habeas corpus by a person in custody under

14  a judgment of a state court may be granted only for violations of the Constitution or laws of

15  the United States. 28 U.S.C. § 2254(a); Williams v. Taylor, 529 U.S. at 375 n. 7 (2000).

16  Federal habeas corpus relief is available for any claim decided on the merits in state court

17  proceedings if the state court's adjudication of the claim:

18  (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as

19  determined by the Supreme Court of the United States; or

20  (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the

21  State court proceeding.

22  28 U.S.C. § 2254(d).

23  1.    Contrary to or an Unreasonable Application of Federal Law

24  A state court decision is "contrary to" federal law if it "applies a rule that contradicts

25  governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are

26  materially indistinguishable from" a Supreme Court case, yet reaches a different result."

27  Brown v. Payton, 544 U.S. 133,  141 (2005) citing Williams, 529 U.S. at 405-06.  "AEDPA

28  does not require state and federal courts to wait for some nearly identical factual pattern

before a legal rule must be applied. . . . The statue recognizes . . . that even a general standard may be applied in an unreasonable manner" Panetti v. Quarterman, 551 U.S. 930, 953 (2007) (citations and quotation marks omitted).  The "clearly established Federal law" requirement "does not demand more than a 'principle' or 'general standard.'" Musladin v. Lamarque, 555 F.3d 830, 839 (2009).  For a state decision to be an unreasonable application of clearly established federal law under § 2254(d)(1), the Supreme Court's prior decisions must provide a governing legal principle (or principles) to the issue before the state court. Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003).  A state court decision will involve an "unreasonable application of" federal law only if it is "objectively unreasonable." Id. at 75-76, quoting Williams, 529 U.S. at 409-10; Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002). In Harrington v. Richter, the Court further stresses that "an unreasonable application of federal law is different from an *incorrect* application of federal law." 131 S. Ct. 770, 785 (2011), (citing Williams, 529 U.S. at 410) (emphasis in original).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. at 786 (citing Yarborough v. Alvarado, 541 U.S. 653, 664 (2004)). Further, "[t]he more general the rule, the more leeway courts have in reading outcomes in case-by-case determinations." Id.; Renico v. Lett, 130 S. Ct. 1855, 1864 (2010). "It is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." Knowles v. Mirzayance, 556 U.S. 111, 129 S. Ct. 1411, 1419 (2009), quoted by Richter, 131 S. Ct. at 786.

### 2. Review of State Decisions

"Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the claim rest on the same grounds." See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).  This is referred to as the "look through" presumption. Id. at 804; Plascencia v. Alameida, 467 F.3d 1190, 1198 (9th Cir. 2006). Determining whether a state court's decision resulted from an unreasonable legal or factual conclusion,"does not require that there be an opinion from the state court explaining the state

court's reasoning." <u>Harrington</u>, 131 S. Ct. at 784-85. "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." <u>Id.</u> ("This Court now holds and reconfirms that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'").

<u>Harrington</u> instructs that whether the state court decision is reasoned and explained, or merely a summary denial, the approach to evaluating unreasonableness under § 2254(d) is the same: "Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." <u>Id.</u> at 786. Thus, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." <u>Id.</u> (citing <u>Lockyer v. Andrade</u>, 538 U.S. at 75). AEDPA "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents." <u>Id.</u> To put it yet another way:

> As a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

<u>Id.</u> at 786-87. The Court then explains the rationale for this rule, i.e., "that state courts are the principal forum for asserting constitutional challenges to state convictions." <u>Id.</u> at 787. It follows from this consideration that § 2254(d) "complements the exhaustion requirement and the doctrine of procedural bar to ensure that state proceedings are the central process, not just a preliminary step for later federal habeas proceedings." <u>Id.</u> (citing <u>Wainwright v. Sykes</u>, 433 U.S. 72, 90 (1977).

### 3.   Prejudicial Impact of Constitutional Error

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 623 (1993); <u>see also</u> <u>Fry v. Pliler</u>, 551 U.S. 112, 121-22

(2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).  Some constitutional errors, however, do not require that the petitioner demonstrate prejudice.  See Arizona v. Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S. 648, 659 (1984).  Furthermore, where a habeas petition governed by AEDPA alleges ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), the Strickland prejudice standard is applied and courts do not engage in a separate analysis applying the Brecht standard.  Avila v. Galaza, 297 F.3d 911, 918, n. 7 (2002);  Musalin v. Lamarque, 555 F.3d at 834.

**IV.    REVIEW OF PETITIONER'S CLAIMS**

    **A.    Dismissal Of Juror Violated Petitioner's Due Process Rights**

Petitioner first contends that the state court's dismissal of juror no. 9 before deliberations denied him his right to due process.

    1.    State Court Decision

Petitioner presented this claim on direct appeal which was denied in a reasoned decision by the Fifth District Court of Appeal and summarily denied by the California Supreme Court.  Because the California Supreme Court's opinion is summary in nature, this Court "looks through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have issued a reasoned opinion.  See Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n.3 (1991) (establishing, on habeas review, "look through" presumption that higher court agrees with lower court's reasoning where former affirms latter without discussion); see also LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th Cir. 2000) (holding federal courts look to last reasoned state court opinion in determining whether state court's rejection of petitioner's claims was contrary to or an unreasonable application of federal law under 28 U.S.C. § 2254(d)(1)).

In denying Petitioner's claim, the appellate court explained:

Discharge of Juror

    Appellants contend that the trial court committed prejudicial error in removing juror No. 9 over objection. Respondent disagrees and argues the trial court properly exercised its discretion. We find no prejudicial error.

a. The Record

On the fifth day of trial, during a break in the court's instructions to the jury, juror No. 9 asked to speak to the court. The juror explained that she realized, only after Chawa's brother testified, that their sister was a student of hers:

"[JUROR 9]: ... I hesitated a lot of coming or not. I know the family of Chawa See. His sister is my student, but-

"THE COURT: You didn't know that before.

"[JUROR 9]: I didn't know that before it was coming up. I didn't even know they were from Lindsay. I didn't know until today.

"THE COURT: Okay.

"[JUROR 9]: I recognize the face of Nalae See, the sister of Chawa. And then I also have to add if you're gonna ask me, 'Is that gonna change the way you deliberate,' I don't think so, but it affects my feelings and my hearts.

"THE COURT: What do you mean, it affects your feelings and your hearts?

"[JUROR 9]: Well, no, no, no. Actually, I've been thinking about Nalae, but it won't change the way - my opinions. I already made up my mind.

"THE COURT: Well, you really can't make up your mind before you deliberate with the other jurors, so I hope you didn't make up your mind yet.

"[JUROR 9]: See? I'm confusing things. I understand.

"THE COURT: I understand.

"[JUROR 9]: Do I go back and say everything again...."

The court then stated what it needed was some clarity on the juror's "actual relationship" with the family. Juror No. 9 explained that she was a high school teacher and Nalae was currently a student of hers and had been since last year. Juror No. 9 had never met Nalae's parents or anyone else in the family. She did not know any of the other witnesses. The court then asked if Juror No. 9 could "set that aside" or whether she would feel "pressure one way or another" because she was her student. The following colloquy then occurred:

"[JUROR 9]: No. I was just trying to give you an opinion, since I was chosen as the last juror to put on the panel, if you could go ahead and pick one of the two remaining ones.

"THE COURT: You're saying you'd have trouble deciding the case, is what you're saying.

"[JUROR 9]: No. Well, it makes me feel bad."

The prosecutor then stated he thought "we could stipulate," but Chawa and Aitang's counsel disagreed. The court again asked juror No. 9 if this information was going to affect her ability to judge the case, noting that she vacillated between saying it would not affect her, telling the court that she was ready for an alternate to take her place, and that this information "affects your heart." Juror No. 9 again stated, "[I]nthe human part I'm thinking about Nalae." When asked if the "human part" kept her from being fair, she said, "No, I will be fair."

Aitang's counsel questioned the juror, asking whether, despite the discovery of this information, she could still be fair and impartial. The juror responded that she could, but also mentioned again the idea of being replaced with an alternate juror. When told that decision was not hers but up to the court, juror No. 9 said she "brought the situation to you so that you decide."

The prosecutor questioned juror No. 9 and asked how she would feel about going back to the classroom to teach Chawa's sister if she were to find Chawa guilty. Juror No. 9 claimed it would not make her hesitant to actually find him guilty, "[b]utif I say he's guilty, I'm pretty sure tomorrow when I go back to school ... I will be looking at Nalae and maybe feeling bad." When asked again, she again said she would not be hesitant to actually find him guilty, but she would "feel bad" for his sister.

Juror No. 9 also expressed some concern that the students at her school were able to infer, due to her absence from school, that she was on the jury involving Chawa's family. But she again denied that this concern would keep her from finding Chawa guilty.

The trial court then asked the juror to return to the jury room. Following a lunch recess, the prosecutor asked that the court remove the juror, noting that she not only knew someone she could sympathize with, but that the deadliness of the OT gang added a "fear aspect." The prosecutor summarized, "The point is that it's highly prejudicial to the People's case keeping her on, whereas if we remove her there's no prejudice to anybody's side...."

Aitang's counsel, Chawa's counsel, and Lavang's counsel each objected, arguing, in essence, that juror No. 9 expressed an eagerness to render a fair and impartial verdict. But the prosecutor noted that, had Juror No. 9's relationship with Chawa's sister been known at the beginning of trial, she would have been excused immediately.

The trial court, noting that juror No. 9 "fumbled on her words a little bit" because English was not her first language, nonetheless decided to keep the juror, stating it was "not convinced that she can't be fair." But later, following the parties' closing arguments, the court again addressed the issue. Addressing juror No. 9 in chambers, the court stated that, after reconsidering, it had determined it would excuse her because keeping her on the jury would be "asking too much of the juror to set [the relationship] aside and ignore it all and try to be objective." For the record, the court then stated its reasons for excusing the juror:

"As I thought about it, I realized that clearly she would have been excused had she brought up that fact at the beginning of the trial. I want to specifically say the prosecutor did not sway my mind whatsoever. I'm thinking for the integrity of the system we

probably need to excuse a juror like that that can be observed by an impartial observer to somehow have some information about this case. If she voted guilty, she'd have to go back and face the actual sister of the person that she found guilty. If she found them not guilty and a personal observer can say, well, she knows ... [¶] ... [¶] ... she was biased. I think just for the integrity of the system, even though she said she could be fair and impartial, I think it would be an undue burden to place upon anybody in this system. We attempt to get jurors that have nothing to do with either side, and that's what we would have done in the first place had we known she would have been involved in some way, we would have clearly-I would have excused her right off the bat."

Although Chawa's counsel stated, "I think that that's a sound reason. I have no objection," Aitang's counsel reiterated his earlier objection.

A criminal defendant has a fundamental constitutional right to a fair trial by an impartial jury. (See People v. Cleveland (2001) 25 Cal.4th 466, 487-488, 106 Cal. Rptr. 2d 313, 21 P.3d 1225 (conc. opn. of Werdegar, J.).) However, that constitutional right does not entitle a defendant to a jury composed of any particular individuals. (People v. Hamilton (1963) 60 Cal.2d 105, 128, 32 Cal. Rptr. 4, 383 P.2d 412, disapproved on other grounds in People v. Morse (1964) 60 Cal.2d 631, 637, fn. 2, 36 Cal. Rptr. 201, 388 P.2d 33.)

Section 1089, provides in relevant part: "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, ... the court may order the juror to be discharged." A trial court's decision to remove a juror is reviewed under an abuse of discretion standard and will be upheld only if that juror's disqualification appears on the record as a demonstrable reality. (People v. Wilson (2008) 43 Cal.4th 1, 26, 73 Cal. Rptr. 3d 620, 178 P.3d 1113.)

"[¶] The demonstrable reality test entails a more comprehensive and less deferential review [than the substantial evidence test]. [The demonstrable reality test] requires a showing that the court as trier of fact did rely on evidence that, in light of the entire record, supports its conclusion that bias was established. It is important to make clear that a reviewing court does not reweigh the evidence under either test. Under the demonstrable reality standard, however, the reviewing court must be confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied." (People v. Barnwell (2007) 41 Cal.4th 1038, 1052-1053, 63 Cal. Rptr. 3d 82, 162 P.3d 596, original italics.)

The court's exercise of discretion to exclude a juror, who would be called on to judge the credibility of a witness and the defendant, both brothers of a current student, is analogous to the "cause" challenge utilized in ordinary jury voir dire. Potential jurors are questioned during voir dire whether they are familiar with the defendants and/or potential witnesses, so that the court can determine whether any of the jurors have an actual, or potential, bias concerning the case. (See Code Civ. Proc., § 225, subd. (b)(1); People v. Jimenez (1992) 11 Cal.App.4th 1611, 1622, 15 Cal. Rptr. 2d 268, disapproved on another ground in People v. Kobrin (1995) 11 Cal.4th 416, 419, 45 Cal. Rptr.

2d 895, 903 P.2d 1027.) As juror No. 9 told the trial court, she was not aware until after Chawa's brother testified for the defense that their sister Nalae was a current student of hers. Had this fact been known prior to the start of trial, there is no question that she would have been excluded during voir dire. An admission by a juror that an extraneous matter might enter into his or her thought processes is adequate ground for the exclusion of a juror for cause. (See, e.g., People v. Hecker (1990) 219 Cal.App.3d 1238, 1242-1243, 268 Cal. Rptr. 884 [juror informed the court she had seen defendant attending her church].)

In People v. Abbott (1956) 47 Cal.2d 362, 303 P.2d 730, the court upheld the trial court's discharge of a juror who worked in the same office as the defendant's brother, using a desk only 25 feet away, despite the juror's statement that he did not know the brother and his belief that he could render an impartial verdict and did not wish to be relieved. (Id. at pp. 370-371.) The trial court stated that the reason for discharge of the juror was "because of [the juror's] proximity to [defendant's] brother in the office where they worked and in order to save [the juror] from embarrassment or criticism," as there were people in the office who knew both men. (Id. at p. 371.)

Here, we find no error. However, if error occurred, we would find no prejudice.

"It is long-established law in California that where an alternate juror, approved by defendant in voir dire, is allowed to deliberate on the jury panel, the defendant bears a heavy burden to demonstrate that he was somehow harmed thereby." (People v. Hall (1979) 95 Cal.App.3d 299, 307, 157 Cal. Rptr. 107; see also People v. Hamilton, supra, 60 Cal.2d at p. 127.)

Appellants have failed to satisfy even a minimal burden. This is not a case in which the record indicates a deadlocked jury was suddenly able to reach a verdict after substitution of an alternate. (See People v. Delamora (1996) 48 Cal.App.4th 1850, 1856, 56 Cal. Rptr. 2d 382.) It is not a case in which a juror who was favorable to acquittal was excused before or during deliberations. (See People v. Cleveland, supra, 25 Cal.4th at pp. 485-486; People v. Hamilton, supra, 60 Cal.2d at p. 127.) Instead, this is a case like People v. Abbott (1956) 47 Cal. 2d 362, 303 P.2d 730, discussed in Hamilton, in which there is "no showing that the juror would have been more favorable to one side or the other." (People v. Hamilton, supra, at p. 127.) No prejudice occurred.

(Lodged Doc. 1, pp.18-23).

2.    Analysis

To the extent that Petitioner is contending that the trial judge abused his discretion under state law to dismiss the juror, such a contention is not cognizable in federal habeas proceedings. Generally, issues of state law are not cognizable on federal habeas. Estelle v. McGuire, 502 U.S. 62, 67 (1991) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.' "); Gilmore v. Taylor, 508 U.S. 333, 348-49 (1993) (O'Connor, J., concurring) ("mere error of state law, one that does not rise to the level of a

constitutional violation, may not be corrected on federal habeas"). Federal courts are bound by state court rulings on questions of state law. Oxborrow v. Eikenberry, 877 F.2d 1395, 1399 (9th Cir. 1989). Further, "the availability of a claim under state law does not of itself establish that a claim was available under the United States Constitution." Sawyer v. Smith, 497 U.S. 227, 239 (1990). Thus, to the extent that Petitioner's claim is premised upon the state court's misapplication of California law, it is not cognizable in these proceedings.

However, "[i]n all criminal prosecutions," state and federal, "the accused shall enjoy the right to . . . trial . . . by an impartial jury," U.S. Const., Amends. 6 and 14; see Duncan v. Louisiana, 391 U.S. 145 (1968); Irvin v. Dowd, 366 U.S. 717, 722 (1961). A trial court's decision to substitute a juror without good cause can establish a Sixth Amendment violation. Perez v. Marshall, 119 F.3d 1422, 1426 (9th Cir. 1997).

Under California law, a trial court may order a juror discharged if the juror dies or becomes ill, or if good cause for the removal is shown. Cal. Penal Code § 1089. The trial court's authority to remove a juror does not end once the jury begins its deliberations; rather, the trial court can remove a juror "at any time." Id. Once it has removed a juror, the trial court may then substitute an alternate juror for the removed juror. Id.

The Ninth Circuit has consistently held that "the California substitution procedure ...preserve[s]the 'essential feature' of the jury required by the Sixth and Fourteenth Amendments." Miller v. Stagner, 757 F.2d 988, 995 (9th Cir.1985) (holding trial court did not violate petitioner's right to jury trial by removing two jurors and replacing them with two alternate jurors despite that original jurors were removed on fifth day of jury deliberations).

When a petitioner challenges a California trial court's removal of a juror, the reviewing court need only decide whether the application of California's procedure violated the petitioner's Sixth Amendment rights. Perez v. Marshall, 119 F.3d 1422, 1426 (9th Cir. 1997). To make this decision, the reviewing court must determine whether good cause existed to support the juror's removal. Id. In making this determination, the reviewing court must be mindful that a trial court's findings regarding juror fitness are entitled to special deference on habeas review. Id. (citing Patton v. Yount, 467 U.S. 1025, 1036-38 (1984)). A trial judge's

1    exercise of his or her responsibility to be "ever watchful to prevent prejudicial occurrences and

2    to determine the effect of such occurrences when they happen," Smith, 455 U.S. at 217 n.

3    7, inherently involves the trial court's "appraisal of witness credibility and demeanor."

4    Thompson v. Keohane, 516 U.S. 99, 111 (1995). In performing that function, the trial judge

5    is best positioned to make decisions regarding credibility and demeanor; hence, the

6    "judgment of the jurist-observer" has been given "presumptive weight" in these matters. Id.

7    Thus, juror impartiality is a factual issue that is within the statutory presumption of

8    correctness. Id.; Wainwright v. Witt, 469 U.S. 412, 429 (1985); Tinsley, 895 F.2d at 525

9    ("findings of state trial and appellate courts on juror impartiality deserve 'a high measure of

10   deference.'"); see Skilling v. United States, 130 S.Ct. 2896, 2918 (2010) ("reviewing courts

11   are properly resistant to second-guessing the trial judge's estimation of a juror's

12   impartiality....").

13       Upon review, the Court is satisfied that the reasons stated by the state court for

14   dismissing juror no. 9 were adequate to establish good cause and to satisfy any constitutional

15   concerns. The trial judge spoke on two separate occasions with juror no. 9 before initially

16   declining to dismiss her, and then, after further consideration, deciding that dismissal was

17   required. As reasons for the dismissal, the state trial judge indicated that he believed the

18   "integrity of the system" required excusing juror no. 9, that if she voted guilty, she would have

19   to face Petitioner's sister, one of her students, when she returned to work, and that if she

20   found Petitioner not guilty, she would almost certainly raise concerns that her relationship with

21   Petitioner's sister had influenced her verdict. The court then went on to note that if juror no.

22   9 had disclosed this relationship during voir dire, he would have "excused her right off the

23   bat." Finally, as the prosecutor noted in requesting the juror's dismissal, there would be

24   potential prejudice to the prosecution if juror no. 9 remained to deliberate, but there would be

25   no prejudice to either side if she were excused and replaced by an alternate juror. Under

26   these circumstances, and giving the trial court its due deference on the factual determination

27   as to juror no. 9's fitness to deliberate, the state court's reasons for dismissing juror no. 9

28   were more than sufficient to satisfy the "good cause" requirement. Perez, 119 F.3d at 1426.

1    Petitioner, in his traverse, makes no credible arguments to undermine the showing of good

2    cause. Petitioner compares and contrasts the reasonableness of retaining or dismissing jurors

3    as discussed in several California cases. However, the holding of each case is fact specific,

4    and the holdings are not determinative of other cases. Here, the court found that there was

5    good cause based the external influences that would make it difficult for the juror to remain

6    objective.

7           While the last reasoned state decision did not discuss the Sixth Amendment standard

8    apart from Petitioner's claims of violation of California law under Cal. Penal Code §1089, it

9    is presumed that the California court addressed Petitioner's sixth amendment challenge. See

10   Johnson v. Williams, 133 S. Ct. 1088, 1098-99 (2013) ("Regardless of whether a California

11   court would consider [Petitioner's] §1089 and Sixth Amendment claims to be perfectly

12   coextensive, the fact that these claims are so similar makes it unlikely that the California

13   Court of Appeal decided one while overlooking the other."). The reasons provided by the state

14   court also support a finding that the rejection of Petitioner's federal claim was reasonable.

15          Furthermore, the Court agrees with the California court that any error would be

16   harmless. In Brecht v. Abrahamson, 507 U.S. 619 (1993), the U.S. Supreme Court

17   substantially restricted state prisoners' access to federal habeas relief by requiring a showing

18   that the violation of a federally guaranteed right had a "substantial and injurious effect or

19   influence in determining the jury's verdict." Brecht, 507 U.S. at 623 (quoting Kotteakos v.

20   United States, 328 U.S. 750, 776 (1946)). In order for an error to have a "substantial and

21   injurious effect or influence," it must have "affected the verdict." O'Neal v. McAninch, 513 U.S.

22   432 (1995). Thus, if the evidence is not merely sufficient, but so powerful, overwhelming, or

23   cumulative that the error simply could not reasonably said to have substantially swayed the

24   jury's judgment, the error is not harmful.

25          Here, the evidence that Petitioner was the individual who shot and killed the victim was

26   considerable: witnesses identified Petitioner as one of the group of individuals who, while

27   wearing gang-colored bandanas that covered their faces from the nose down, approached

28   the victim. Witnesses at trial identified Petitioner as a member of the group who approached

and shot the victim. (RT 132-33; 203-05; 243.) The former girlfriend of one of the co-defendant's testified that another co-defendant confessed that he shot the victim because he was "dissing the hood." Moreover, the handgun used to kill the victim was found in a co-defendant's bedroom. (RT 383; 434-440; 519-533.) Finally, the gang evidence presented at trial established Petitioner's participation in the gang, the gang's violent criminal methodology, including protecting its own "turf," and that the victim was identified as a member of a rival gang. Petitioner has not presented any substantive reason why the dismissal of juror no. 9 was in any way improper or prejudicial to him. Under all of these circumstances, the state court's dismissal of juror no. 9 could not reasonably be said to have swayed the jury's judgment, and thus, any error was harmless. Brecht, 507 U.S. at 623.

The California Court of Appeal decision denying this claim was not contrary to clearly established Supreme Court precedent. Accordingly, Petitioner is not entitled to habeas relief.

**B.   Introduction Of Excessive Gang Evidence Denied Petitioner A Fair Trial**

Petitioner next contends that the state court's admission of gang evidence was excessive and prejudicial, violating his right to a fair trial.

1.   State Court Decision

Petitioner presented this claim on direct appeal which was denied in a reasoned decision by the Fifth District Court of Appeal and summarily denied by the California Supreme Court.  Because the California Supreme Court's opinion is summary in nature, this Court "looks through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have issued a reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. at 804-05 & n.3.

The state appellate court denied Petitioner claim and stated the following:

**Admission of Gang Evidence**

The prosecutor introduced evidence of the following predicate crimes to establish the gang allegations and substantive gang offense:

(1) On June 30, 2004, OT members approached an ice cream truck and took some ice cream without paying. When the truck owner demanded payment, one OT member went around the corner, put a blue bandanna over his face, came back, and fired multiple gunshots at the truck. The shooter was convicted of attempted murder with a gang enhancement.

(2) Also on June 30, 2004, an OT member and Aitang went into a convenience store and took beer without paying for it. When the security guard tried to stop them, the OT member turned and opened fire on the guard. The shooter was convicted of robbery and attempted murder with a street gang enhancement. A juvenile petition against Aitang for robbery with a gang enhancement was sustained.

(3) Also on June 30, 2004, Aitang was arrested for attempting to rob a person of his bicycle. A juvenile petition was sustained against Aitang for attempted robbery with a gang enhancement.

(4) On November 15, 2004, an OT member was involved in a verbal conflict over turf with a Norteno gang member. The OT member shot and killed the Norteno member, and was convicted of murder with a criminal street gang enhancement.

(5) On March 10, 2005, police contacted Chawa regarding a vehicular burglary and theft of the car stereo. Chawa was with another OT member at the time. A juvenile petition against Chawa for vehicular burglary was sustained.

(6) On April 6, 2005, Chawa was involved in a verbal altercation in which he threatened to shoot his ex-girlfriend's family. During the altercation, he identified himself as a person "who associates with ... gangs." A juvenile petition against Chawa for making a criminal threat was sustained.

(7) On April 30, 2005, OT members approached a Norteno gang member. One OT member then shot and killed the Norteno. The OT gang member pled guilty to manslaughter with a criminal street gang enhancement.

(8) On December 20, 2005, police conducted a probation search of Chawa's bedroom and found a handgun. Lavang was present, but Chawa was not. A juvenile petition against Chawa for being a minor in possession of a handgun was sustained.

(9) On May 8, 2006, an OT member was involved in a conflict over turf with a 15-year-old girl wearing a red shirt. The gang member fired a shot at the girl, missing her, but killing her older sister. The OT gang member was convicted of murder with a criminal street gang enhancement.

(10) On an unspecified date, OT and Norteno gang members were involved in a verbal and physical altercation in a convenience store. An OT member shot and paralyzed a Norteno member. The OT member was convicted of assault with a firearm, mayhem, and shooting into a building, all with criminal street gang enhancements.

The prosecution also introduced the following field contacts:

(1) On March 10, 2005, Chawa was booked into juvenile hall wearing blue shoes.

(2) On April 7, 2005, Chawa was booked into juvenile hall wearing a blue sweater.

(3) On May 3, 2005, in response to a report of a family disturbance, officers spoke with Chawa, who was wearing a blue shirt and admitted being a Crip.

(4) On May 7, 2005, an officer contacted Chawa and found he had a blue bandanna. Chawa denied being a Crip, but stated he did "have Lahu pride."

(5) On October 18, 2006, when booked at juvenile hall, Chawa admitted being an OT member. He had gang-related tattoos on his hand.

(6) On December 12, 2007, Chawa, recaptured after escape, claimed he was an OT member.

(7) On August 30, 2005, police contacted Lavang about a petty theft. Lavang was with an OT member at the time.

(8) On November 8, 2005, an officer responded to a 911 call and noted Lavang and other OT members were present.

(9) On December 1, 2003, an officer contacted Lavang about gang graffiti on his books. He was wearing a blue shirt and admitted being a LPC member.

(10) On January 30, 2006, an officer contacted Lavang. He was wearing a blue sweater and  shorts and admitted being an OT member.

(11) On October 17, 2006, when booked on the current offense, Lavang claimed OT membership.

(12) On December 12, 2007, Lavang, recaptured after escape, claimed he was an OT member. (See fn. 4 on p. 8, ante.)

(13) On February 6, 2008, when Lavang turned 18 and was transferred to county jail, he filled out a questionnaire in which he claimed OT membership.

(14) On January 8, 2004, a detective contacted Aitang as a suspect in an armed robbery.

(15) On January 15, 2004, an officer stopped Aitang, who was riding a bike at the time. Aitang admitted writing "LPC" on his bicycle and being an LPC member.

(16) On February 3, 2004, an officer contacted Aitang at school. He admitted being a LPC gang member and had five dots tattooed on his left hand.

(17) On February 9, 2004, a detective contacted Aitang, who was a passenger in a stolen vehicle. He was wearing a blue hat and a blue jersey and was in the company of two other OT members.

(18) On April 9, 2004, an officer contacted Aitang, who was wearing a blue and white shirt. He was in the company of other known OT members and admitted being an LPC.

(19) On May 10, 2004, an officer contacted Aitang in the home of another OT member. The officer was responding to a call of fired shots.

(20) On May 26, 2004, an officer contacted Aitang, who was in the company of two other OT members. Aitang had a blue bandanna and admitting having been an LPC for one year.

(21) On June 11, 2004, a probation officer contact Aitang, who was in the company of another OT member. Aitang was wearing a blue shirt, had a blue bandanna, and admitted being an LPC.

(22) On July 1, 2204, an officer contacted Aitang, who was in the company of an OT member. Aitang was wearing a blue shirt.

(23) On December 30, 2004, when booked into juvenile hall, Aitang was wearing a blue shirt and blue shorts.

(24) On October 6, 2006, when booked at juvenile hall, Aitang admitted Crip gang affiliation.

(25) On December 12, 2007, Aitang, when recaptured after escape, claimed OT membership. (See fn. 4 on p. 8, ante.)

Appellants contend the predicate offenses and field contacts admitted in proving the existence of a criminal street gang and appellants' active participation in the gang, for purposes of section 186.22, subdivision (b)(1)(C) and section 190.2, subdivision (a)(22), were unnecessarily cumulative and unduly prejudicial. In addition, Chawa specifically contests the admission of his prior juvenile adjudications for criminal threat and possession of a handgun (predicate offenses Nos. 6 and 8, ante) into evidence.

The People argue that appellants failed to timely object in the trial court to the evidence about which they now complain, with the exception of Chawa's juvenile adjudications for criminal threat and minor in possession of a handgun, and therefore have forfeited their objections. Because appellants argue ineffective assistance of counsel in the alternative, should we find waiver, we address the issue on the merits and find no prejudicial error.

a. Standard of Review

The trial court has discretion in determining the admissibility of evidence, and on appeal we find reversible error only if the trial court's exercise of its discretion was arbitrary, capricious, or patently absurd resulting in a manifest miscarriage of justice. (People v. Ochoa (2001) 26 Cal.4th 398, 437-438, 110 Cal. Rptr. 2d 324, 28 P.3d 78, abrogated on another point as stated in People v. Prieto (2003) 30 Cal.4th 226, 263, fn. 14, 133 Cal. Rptr. 2d 18, 66 P.3d 1123.)

b. Gang Evidence

In order to subject appellants to gang-related sentence enhancements under section 186.22, subdivision (b)(1), the prosecution was required to prove that the crime for which appellants were convicted was "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members...." In order to prove the section 190.2, subdivision (a)(22) allegation, the prosecutor had to show that the appellants intentionally killed the victim while each was "an active participant in a criminal street gang ... and the murder was carried out to further the activities of the criminal street gang." A "criminal street gang" means "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of [certain specified crimes], having a common name or common identifying sign or symbol, and whose

members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (§ 186.22, subd. (f).) "Sufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute." (People v. Sengpadychith (2001) 26 Cal.4th 316, 324, 109 Cal. Rptr. 2d 851, 27 P.3d 739, italics in the original.) And a "pattern of criminal gang activity" is defined as participation in two or more statutorily enumerated criminal offenses (the predicate offenses) that are committed within a statutorily defined period and "on separate occasions, or by two or more persons." (§ 186.22, subd. (e).) "[A] pattern can be established by two or more incidents, each with a single perpetrator, or by a single incident with multiple participants committing one or more of the specified offenses." (In re Nathaniel C. (1991) 228 Cal.App.3d 990, 1003, 279 Cal. Rptr. 236.)

Gang evidence, including expert testimony, is admissible to prove the elements of the substantive gang crime and gang enhancements if it is logically relevant to some material issue in the case other than character evidence, is not more prejudicial than probative, and is not cumulative. (People v. Avitia (2005) 127 Cal.App.4th 185, 192, 24 Cal. Rptr. 3d 887.) Thus, a properly qualified gang expert may testify about a wide range of issues, including a gang's territory, retaliation, graffiti, hand signals, tattoos, and clothing. (People v. Ochoa, supra, 26 Cal.4th at pp. 438-439.)

As noted above, the prosecutor introduced evidence of at least 10 crimes committed by OT members, as well as numerous field contacts with appellants, and in argument to the jury the prosecutor referred to several of these incidents. We are unaware of any authority in which the court directly addressed the volume of evidence that may be introduced to establish the primary activities, predicate crimes, and active participation elements of a gang enhancement or gang charge. But any such evidence must be subject to scrutiny under Evidence Code section 352, under which we determine whether the evidence is cumulative and unduly prejudicial.

c. Cumulative Evidence

Courts have recognized that evidence of other crimes may be extremely inflammatory, and the trial court must take great care to evaluate its admissibility. (People v. Albarran (2007) 149 Cal.App.4th 214, 223, 57 Cal. Rptr. 3d 92.) Even if the evidence is relevant, the trial court must carefully scrutinize gang-related evidence before admitting it because of its potentially inflammatory impact on the jury. (Ibid.) The trial court must find that the evidence has substantial probative value that is not outweighed by its potential for undue prejudice. (Evid.Code, § 352; People v. Ewoldt (1994) 7 Cal.4th 380, 404, 27 Cal. Rptr. 2d 646, 867 P.2d 757.)

Appellant contends that the volume of predicate offenses and field contacts admitted here were cumulative and unduly prejudicial. In People v. Leon (2008) 161 Cal.App.4th 149, 73 Cal. Rptr. 3d 786, on which appellants rely, the defendant was convicted of burglary, attempting to dissuade a witness from reporting a crime, possessing a concealed firearm in a vehicle while being an active participant in a criminal street gang, and carrying a loaded firearm while being an active participant in a criminal street gang. (Id. at p. 152.) During trial, the court permitted the prosecutor to introduce evidence of the defendant's 1999 juvenile adjudication for robbery for the purpose of establishing the predicate offenses necessary to establish the section 186.22, subdivision (b)(1) gang enhancement. (Id. at pp. 164-165.)

On appeal, the court held that the trial court abused its discretion in admitting evidence of the defendant's prior juvenile robbery adjudication to establish both that the defendant was a gang member and that the group in question was a criminal gang. The court noted that the robbery convictions of other gang members were sufficient to establish the predicate offenses, and the evidence of the defendant's gang membership was overwhelming. (People v. Leon, supra, 161 Cal.App.4th at p. 169.) Thus, the court held "the evidence of [the defendant's] robbery adjudication was 'merely cumulative regarding an issue that was not reasonably subject to dispute.' [Citation.]" (Ibid.) But the court found the error harmless nonetheless. (Id. at pp. 169-170.)

Appellants also rely on People v. Williams (2009) 170 Cal.App .4th 587, 88 Cal. Rptr. 3d 401, in which police executed a search warrant on a house and found a gun, drug paraphernalia and ammunition in a bedroom and a second gun and drug paraphernalia in the garage. There were seven gang members present at the time, including the defendant. (Id. at pp. 596-597.) The defendant was convicted of gun and drug charges with gang enhancements and participation in a criminal street gang. (Id. at p. 595.)

On appeal, the court found that the trial court abused its discretion in admitting evidence of "at least eight crimes committed by [gang] members," as well as evidence of and of dozens of police/gang contacts. (People v. Williams, supra, 170 Cal.App.4th at pp. 600-602, 609.) The court found the evidence "cumulative" because it "concern[ed] issues not reasonably subject to dispute." (Id. at p. 611.) It nonetheless found introduction of the cumulative gang evidence harmless. (Id. at pp. 612-613.)

Here, the admitted gang evidence and field contacts were numerous. The prosecution introduced five predicate offenses not involving appellants. In addition, one predicate offense involved another gang member and Aitang; one offense involved Aitang alone; and three predicate offenses involved Chawa, although Lavang was present on one of those occasions. In addition to the predicate offenses, the prosecutor introduced evidence of numerous field contacts with appellant. And while appellants seem to concede that admission of gang membership and the wearing of gang colors when contacted by officers indicated active gang participation, they argue that many of the incidents revealed that police contacted the appellants because they were suspects or participants in other offenses or were booked into juvenile hall-irrelevant and unduly prejudicial acts.

As stated in People v. Williams, supra, 170 Cal.App.4th at page 611, "Although no bright-line rules exist for determining when evidence is cumulative, ... application of the term must be reasonable and practical." But here, even assuming arguendo that it was an abuse of discretion to admit cumulative evidence on issues not reasonably subject to dispute, we next evaluate whether the introduction of the cumulative gang evidence was prejudicial error.

d. Harmless Error

We evaluate error in the admission of prior crimes evidence using the standard of People v. Watson (1956) 46 Cal.2d 818, 836, 299 P.2d 243 (Watson), under which we determine whether it was "reasonably probable that a result more favorable to defendant would have resulted" had the prior crimes evidence not been admitted. (People v. Welch (1999) 20 Cal.4th 701, 750, 85 Cal. Rptr. 2d 203, 976 P.2d 754.) But appellants contend that the erroneous

1

admission of evidence rendered the trial fundamentally unfair, and therefore we should review the error under the harmless-beyond-a-reasonable-doubt test set forth in Chapman v. California (1967) 386 U.S. 18, 23-24, 87 S. Ct. 824, 17 L. Ed. 2d 705.)

2

3

Relying on People v. Albarran, supra, 149 Cal.App.4th 214, appellants argue the introduction of gang evidence violated their due process right and led to a fundamentally unfair trial. In Albarran, the court held that there was nothing inherent in the facts of the charged shooting to suggest any gang motive and the gang evidence was highly prejudicial, and the court found defendant's federal due process rights had been violated. (Id. at pp. 227, 230-232.) The court stated, however, that the case before it "present[ed]one of those rare and unusual occasions" where the error was of federal constitutional dimension. (Id. at p. 232.) The court explained, " 'Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must "be of such quality as necessarily prevents a fair trial." [Citations.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose.' [Citation.]" (Id. at p. 229.)

4

5

6

7

8

9

10

11

Here, in contrast, the challenged evidence had direct relevance to and was directly probative of the gang enhancements to establish the predicate offenses and appellants' continuing participation in the gang. There was overwhelming evidence of appellants' guilt of Trevino's murder. Witnesses identified appellants as the males who, while wearing gang-colored bandannas, approached Trevino. Lavang admitted being present during the murder. Chawa was identified as the shooter. Chawa told Lavang's former girlfriend that he shot Trevino because he was "dissing the hood," and the weapon used to kill Trevino was later found in Chawa's bedroom. Ample admissible evidence established appellants' prior and current involvement with the OT gang; all three admitted OT gang membership. We conclude that any error in admitting cumulative gang evidence was harmless under either Watson or Chapman.

12

13

14

15

16

17

(Lodged Doc. 1, pp. 6-18).

18

2.      Analysis

19

As Respondent correctly argues, the United States Supreme Court has expressly left

20

open the question of whether the admission of propensity evidence violates due process. See

21

Estelle v. McGuire, 502 U.S. at 75, n.5; Garceau v. Woodford, 275 F.3d 769, 774 (9th Cir.

22

2001). In Estelle, the Supreme Court expressly refused to determine whether the introduction

23

of prior crimes evidence to show propensity to commit a crime would violate the Due Process

24

Clause. Id. ("Because we need not reach the issue, we express no opinion on whether a state

25

law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to

26

show propensity to commit a charged crime."); see also Alberni v. McDaniel, 458 F.3d 860,

27

866 (9th Cir. 2006) ("Estelle expressly left this issue an 'open question'"). Because the

28

Supreme Court has specifically declined to address whether the introduction of propensity

1   evidence violates due process, Petitioner lacks the clearly established federal law necessary

2   to support his claims. Id.; see also Mejia v. Garcia, 534 F.3d 1036, 1046-47 (9th Cir. 2008)

3   (relying on Estelle and Alberni and concluding that the introduction of propensity evidence

4   under California Evidence Code § 1108 does not provide a basis for federal habeas relief,

5   even where the propensity evidence relates to an uncharged crime); Holley v. Yarborough,

6   568 F.3d 1091, 1101 (9th Cir. 2009) (The Supreme Court "has not yet made a clear ruling

7   that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation

8   sufficient to warrant issuance of the writ.").

9        Accordingly, the state courts' rejection of Petitioner's claim could not have been

10   "contrary to, or an unreasonable application of, clearly established" United States Supreme

11   Court authority, since no such "clearly established" Supreme Court authority exists.28 U.S.C.

12   § 2254(d)(1).

13        Nevertheless, there can be habeas relief for the admission of prejudicial evidence if

14   the admission was fundamentally unfair and resulted in a denial of due process. Estelle, 502

15   U.S. at 72; Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir. 1995); Jeffries v. Blodgett, 5 F.3d

16   1180, 1192 (9th Cir. 1993); Gordon v. Duran, 895 F.2d 610, 613 (9th Cir.1990). Constitutional

17   due process is violated if there are no permissible inferences that may be drawn from the

18   challenged evidence. Jammal v. Van de Kamp, 926 F.2d 918, 919-20 (9th Cir. 1991).

19   "Evidence introduced by the prosecution will often raise more than one inference, some

20   permissible, some not." Id. at 920. "A habeas petitioner bears a heavy burden in showing a

21   due process violation based on an evidentiary decision." Boyde v. Brown, 404 F.3d 1159,

22   1172 (9th Cir. 2005).

23        The California Court of Appeals applied a standard identical to the federal standard.

24   On appeal, the California court found that "evidence of gang membership is admissible if it

25   is logically relevant to a material issue and is more probative than prejudicial. People v. Avitia,

26   127 Cal. App. 4th 185, 192, 24 Cal. Rptr. 3d 887 (2005)." Evidence of gang affiliation is

27   admissible when it is relevant to a material issue in the case. United States v. Easter, 66 F.3d

28   1018, 1021 (9th Cir. 1995) (citing United States v. Abel, 469 U.S. 45, 49, 105 S. Ct. 465, 83

L. Ed. 2d 450 (1984) (finding gang evidence admissible to show bias)). The Court of Appeals concluded that the "challenged evidence had direct relevance to and was directly probative of the gang enhancements to establish the predicate offenses and appellants' continuing participation in the gang. (Lodged Doc. 1 at 18.) The gang evidence was introduced to establish permissible inferences that were essential to the prosecution's theory. See Jammal, 926 F.2d at 919. These inferences include that Petitioner was part of a criminal street gang, Petitioner's motive, and Petitioner's identity. See Abel, 469 U.S. at 49. The California Court of Appeal decision denying this claim was not contrary to clearly established Supreme Court precedent. Accordingly, Petitioner is not entitled to habeas relief.

## V.   FINDINGS AND RECOMMENDATIONS

Accordingly, it is hereby recommended that the petition for a writ of habeas corpus be DENIED with prejudice. It is further recommended that the Clerk of Court be directed to enter judgment.

This Findings and Recommendation is submitted to the assigned District Judge, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1).  Within thirty (30) days after being served with the Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Any reply to the objections shall be served and filed within fourteen (14) days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:    May 24, 2013          /s/ Michael J. Seng
                                    UNITED STATES MAGISTRATE JUDGE

U.S. District Court
E. D. California

-23-